# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA ATLANTA DIVISION

| | | |
|---|---|---|
| JAMES L. ANDERSON | ) | |
| ANDERSON & ASSOCIATES, INC. | ) | |
| | ) | |
|     Plaintiff | ) | |
| | ) | CIVIL ACTION |
| Vs. | ) | |
| | ) | CASE NO. _____ |
| LONESOURCE, INC. | ) | |
| BRADLEY P. KING | ) | |
| | ) | |
|     Defendants | ) | |
| | ) | |
| | ) | |

## COMPLAINT

NOW COME James L. Anderson ("Anderson") and Anderson & Associates, Inc. ("AAI" and collectively with Anderson, "Plaintiffs"), Plaintiffs in the above styled action, and file this Complaint against Lonesource, Inc., a Delaware corporation ("Lonesource"), and its Chief Executive Officer, Bradley P. King ("King"), and respectfully show the Court the following:

### I. PARTIES.

#### A. PLAINTIFFS.

1.    Plaintiff James L. Anderson is a resident of and a citizen of the State of Georgia.  He lives in Fulton County, Georgia.

2.      Plaintiff Anderson & Associates, Inc. is a Georgia corporation with a registered address at 140 Sweetbay Circle, Alpharetta, GA 30022, located in Fulton County.

B. Defendants.

3.      Defendant Lonesource, Inc. is a Delaware corporation with its principal place of business located at 114 Mackenan Dr #300, Cary, North Carolina 27511-7920.

4.      Defendant King is a citizen of the State of North Carolina with an address in Cary, NC.

II. Jurisdiction

5.      This Court has diversity subject matter jurisdiction pursuant to 28 U.S.C. § 1332.  The amount in controversy exceeds $75,000 exclusive of interest and costs.

6.      Defendant Lonesource is a Delaware corporation that has its principle place of business located in North Carolina.  Defendant King is an individual who is resident and domiciled in North Carolina.  Consequently Defendants are citizens of the State of North Carolina under 28 U.S.C. § 1332.

7.      Plaintiff Anderson is an individual who is resident and domiciled in Georgia.  Plaintiff AAI is a Georgia corporation with its principal place of business

in Georgia.  Consequently, Plaintiffs are citizens of the State of Georgia under 28

U.S.C. § 1332.

8.      Plaintiffs' Complaint includes a claim against Defendant Lonesource

under an indemnity provision contained in the Asset Purchase Agreement dated

June 30, 2008 that contains a consent to the jurisdiction of this Court.

9.      Defendant Lonesource is a Delaware corporation that is not

authorized to do business in Georgia (but should be).  Defendant Lonesource

maintains a large operation at 5150 Peachtree Industrial Boulevard, Suite 300,

Norcross, GA 30071, located in Gwinnet County.  Accordingly, Lonesource may

be served by serving an agent within Georgia, as authorized by O.C.G.A. § 9-11-

4(e)(2) and Fed. R. Civ. P. 4(h)(1)(A) and 4(e)(1).

10.     Defendant King is a North Carolina resident and citizen who has

committed intentional torts against Plaintiffs from North Carolina but causing

Plaintiffs harm in Georgia.  Defendant King's tortious actions establish minimum

contacts with Georgia and would subject him to jurisdiction under the Georgia

long-arm statute.  O.C.G.A. § 9-10-91.  Accordingly, Defendant King is subject to

the jurisdiction of a court of general jurisdiction in Georgia under Fed. R. Civ. P.

4(k)(1)(A) and may be served with a summons and a copy of this Complaint as

described in Fed. R. Civ. P. 4(e)(1).

### III. VENUE

11.    Venue is proper in this District under 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the Northern District of Georgia.

12.    Venue is proper under 28 U.S.C. § 1391(a)(3) because Defendants are subject to personal jurisdiction in this district.

### III. PROCEDURAL BACKGROUND – RELATED PROCEEDING

13.    On October 2, 2010 American Express Travel Related Services Company, through a local collections lawyer, filed a Complaint against Defendant Lonesource in the State Court of Fulton County, styled *American Express Travel Related Services Company, Inc. v. Sunbelt Office Products, LLC, Lonesource, Inc. and Brent Fogleman*, Civil Action Case No. 10EV011091-A.

14.    In its October 2, 2010 Complaint, American Express sued Lonesource for approximately $472,294.74 with respect to credit card charges shown on statements that Lonesource initially paid and later reversed.  On information and belief, the American Express statements paid by Lonesource are aggregate statements reflecting the charges of many Lonesource personnel on distinct American Express corporate credit cards for legitimate business purposes.

15.     On information and belief, these statements also contained personal charges for Brent Fogleman.  Mr. Fogleman was sentenced to 15 months in jail on November 30, 2011 for financial transaction fraud against Anderson; Fogleman was not charged for any crimes committed against Lonesourse. (See ¶95 of this Complaint for further details of Fogleman's conviction.)

16.     In March 2010 Defendants Lonesource and King caused Capital Bank to reverse approximately $472,294.74 of payments made by Lonesource to American Express by submitting six Unauthorized or Improper ACH Debit Statements that attest, under penalties of perjury, that payments to American Express were never authorized.  Exhibit 1 to this Complaint shows these ACH statements.

17.     On information and belief, in March 2010 Defendants Lonesource and King also caused Capital Bank to reverse payments made by Lonesource to Chase Bank and also submitted fraudulent Unauthorized or Improper ACH Debit Statements to Capital Bank with respect to payments made to Chase Bank.

18.     On information and belief, in connection with reversing payments to Chase Bank and American Express, Defendants also made defamatory statements to Capital Bank, American Express and Chase Bank to induce them to lay blame

on Plaintiffs for Fogleman's fraudulent use of credit cards while an employee of Lonesource.

19.     According to the sworn statement of Brent Fogleman given on March 23, 2010 prior to the time he was charged with a crime, Mr. Fogleman always obtained prior authorization from his superiors at Lonesource to pay the American Express and Chase statements.  See paragraphs ¶54, ¶72 and ¶73 of this Complaint.

20.     Consequently, these ACH Statements submitted by Lonesource to Capital Bank are fraudulent because Lonesource did authorize Mr. Fogleman to pay the American Express and Chase statements, even if Lonesource and Mr. King did not know that the statements contained some personal charges of Mr. Fogleman.  American Express attached these false ACH Statements as exhibits to its complaint and they are attached to this Complaint as Exhibit 1.

21.     On March 2, 2011 Lonesource filed a Third-Party Complaint against Defendants Anderson and AAI in the above referenced case, *i.e.*, *American Express Travel Related Services Company, Inc. v. Sunbelt Office Products, LLC, Lonesource, Inc. and Brent Fogleman*, Civil Action Case No. 10EV011091-A.

22.     In its March 2, 2011 Third-Party Complaint, Defendant Lonesource at the direction of Defendant King, accused Plaintiffs of converting over $1,200,000 of Lonesource's property and demanded damages.  Defendants also attempted to

make Plaintiffs responsible for Fogleman's fraud by making a variety of clearly false and clearly defamatory statements in the Third-Party Complaint, including that "Fogleman, acting as an agent for Anderson and AAI, used Lonesource's funds to pay the balance of his personal expenditures." (¶31 of the Third-Party Complaint.)

23.    On information and belief, beginning approximately with Defendant's reversal of payments to American Express and Chase in March 2010, Plaintiffs have tried to convince American Express (and Chase and Capital Bank) that Plaintiffs Anderson and AAI have responsibility for Fogleman's fraud for reasons similar to those set forth in the Third-Party Complaint.

24.    After receiving the Lonesource's Third Party Complaint, Anderson and AAI then endeavored to show Lonesource that its Third-Party Complaint had absolutely no merit and, in fact, that Lonsource was liable to Anderson and AAI. On March 31, 2011, Lonesource dismissed without prejudice its Third-Party Complaint against Anderson and AAI.

25.    Thereafter, Anderson and AAI made written demand on Lonesource and attempted to negotiate a compromise of Anderson and AAI's claims against Lonesource.  These efforts did not produce a result and Lonesource broke off discussions by e-mail on May 19, 2011.

26.     On June 2, 2011, Lonesource served its First and Continuing Request for Production of Documents to Anderson & Associates, Inc. and James L. Anderson.  Most of the documents requested are in the possession of Lonesource. Lonesource purchased the corporate and business records of AAI on June 30, 2008.  Anderson and AAI have previously requested copies of these records, as they are entitled to do under the June 30, 2008 Asset Purchase Agreement and Lonesource has not delivered these records.   This is an example of Lonesource's abusive behavior.

27.     The above referenced suit names Sunbelt Office Products, LLC as a defendant; that company was formed by Anderson in May 1999, ceased conducting business in June 2000, and was administratively dissolved in July 2005.

28.     According to advice given to Anderson over the phone, the AMEX corporate credit cards at issue in the above referenced litigation are not the cards of Anderson or AAI.  Because Anderson and AAI are not parties to such corporate cards, American Express will not provide Anderson or AAI with any information about them.  Consequently, we do not expect American Express to pursue Anderson or AAI, although it is possible.

29.     While it is clear that Defendants Lonesource and King attempted, through the submission of fraudulent ACH Statements, to shift the cost of the

$472,294.74 of charges from Lonesource onto Anderson and AAI, in an effort to harm Anderson and AAI and enrich Lonesource, that effort presently appears to have failed.

## IV. THE FACTS

30.     Prior to June 30, 2008 AAI was in the business of selling office supplies and operated under the name "Sunbelt Office Products." On June 30, 2008 AAI sold substantially all of its assets and business, including the name "Sunbelt Office Products" to Lonesource under the terms of an Asset Purchase Agreement by and among Lonesource, AAI and its shareholders.  From July 1, 2008 to the present, Lonesource operated the business it purchased from AAI under the name "Sunbelt Office Products."

31.     Anderson, his wife, Ronnilee P. Anderson, and Brian Rossi were shareholders of AAI at the time of the sale to Lonesource and were parties to the Asset Purchase Agreement.  Anderson was President of AAI and Brain Rossi was AAI's Vice President of Sales.

32.     On July 1, 2008 Mr. Rossi became a Senior Vice President of Lonesource and Division President under the terms of a written employment agreement and had management responsibility over the Atlanta office, more or less, until he resigned in May 2011.

33.     On June 30, 2008 in connection with the asset sale to Lonesource,

AAI terminated its employees, including Brent Fogleman.  On July 1, 2008, all of

those employees, except Anderson himself, were hired by Lonesource as

employees and continued to perform their jobs in the ordinary course of business.

Mr. Fogleman was among the former employees of AAI to become employees of

Lonesource on July 1, 2008.

34.     Prior to hiring Fogleman on July 1, 2008, Lonesource did not perform

a background check of any type on Fogleman or even a proper interview.

35.     At no time after AAI terminated Fogleman from AAI on June 30,

2008 was Fogleman an employee or agent of Anderson or AAI.

36.     The Asset Purchase Agreement did not obligate Lonesource to hire

Fogleman or any employee of AAI (except Mr. Rossi, a party to an employment

agreement with Lonesource).  At no time during the negotiation of the sale of

assets to Lonesource did Anderson insist that Lonesource hire Fogleman.  The

Asset Purchase Agreement makes no relevant representations or warranties about

its employees or about Mr. Fogleman.

37.     Section 31 of the Asset Purchase Agreement contains an integration

clause that provides:

"Section 31.  Entire Agreement.  This Agreement, together with the Exhibits
and Schedules hereto, constitutes the entire agreement between the parties

with respect to the matters set forth herein and supercedes all prior agreements and understandings between the parties with respect to the same, including without limitation, the Letter of Intent, dated May 8, 2008, between the Buyer and the Seller, which is hereby terminated in all respects."

38.     In connection with that sale, Anderson entered into a Consulting Agreement and a related Non-Competition Agreement with Lonesource on June 30, 2008 that, among other things, imposed a non-competition obligation on Anderson.  The Consulting Agreement also provided for essentially mandatory payments to Anderson, without regard to how much or how little he performed services for Lonesource.  By its terms, the Non-Competition Agreement would terminate if Lonesource failed to make the requisite payments under the Consulting Agreement.

39.     After the sale, Anderson worked at Lonesource's offices (the former offices of AAI) in Atlanta from July 2008 to September 2008; in September 2008 it became clear to Anderson that his services in the office were not needed. Accordingly, Anderson ceased coming to Lonesource's offices in September 2008 and was officially banned from the office in March 2010.  Outside of an occasional consultation, Anderson has had no involvement in Lonesource's affairs since September 2008.

40.    On June 30, 2008, at the closing of the sale of assets by AAI to Lonesource, Lonesource requested and AAI agreed to permit Lonesource to use credit cards issued to AAI by American Express (AMEX) and Chase until Lonesource acquired its own cards, with Lonesource assuming liability for the use of the cards and paying the charges on the statements.  This agreement was reached by Anderson, on behalf of AAI, and Brad King, CEO of Lonesource and Stacy King, COO of Lonesource, and David Ryan, Lonesource's CFO.

41.    Lonesource appears to confirm the existence of some form of agreement in ¶25 of its March 2, 2011 Third-Party Complaint, although Lonesource misstated and mischaracterized the agreement.  Lonesource alleged: "As part of the Sunbelt Transaction, Lonesource did not assume the corporate credit card accounts that AAI had with American Express or Chase.  Instead, Anderson and/or AAI permitted the holders to continue using the credit cards indefinitely until Lonesource secured credit cards from its corporate account to issue to its authorized agents."

42.    This agreement was not reduced to writing and Anderson and AAI received no consideration for permitting Lonesource to use the credit cards. Anderson granted permission to Lonesource solely as an accommodation to

Lonesource.  The parties essentially created a gratuitous bailment of the credit cards for the benefit of Lonesource.

43.    Essentially, Lonesource seems to have come to the closing on June 30, 2008 without appreciating that it needed credit cards in place in order to operate the Sunbelt Office Products business it was purchasing.  Lonesource's lack of diligence and preparation resulted in the necessity that it ask Anderson and AAI for permission to use the American Express and Chase cards.

44.    Lonesource did take possession of the American Express and Chase cards it obtained from Anderson and AAI and used some of them it its business from July 1, 2008 until it discovered Fogleman's fraud in March 2010.

45.    From July 1, 2008 Lonesource received and reviewed American Express and Chase statements for these credit cards and paid the credit card statements regularly until some time in March 2010, when it discovered that Brent Fogleman had used the cards for his personal purposes and wrongfully reversed payments on the credit cards.  See Exhibit 3 for copies of Chase statements (these cards are now terminated and inactive).

46.    From July 1, 2008, statements of both American Express and Chase for charges on credit cards that were used by Lonesource in its business were sent directly to Lonesource not to Anderson.  After June 30, 2008, Anderson and AAI

did not receive statements from American Express or Chase until Anderson

requested them in March 2010, after learning of Fogleman's theft from

Lonesource.

47.     Anderson and AAI did not obtain statements for the Chase credit

cards and American Express Costco Small Business Cards until March 2010 and

has not been able to obtain American Express statements for American Express

corporate cards at issue in *American Express Travel Related Services Company,*

*Inc. v. Sunbelt Office Products, LLC, Lonesource, Inc. and Brent Fogleman*, Civil

Action Case No. 10EV011091-A in the State Court of Fulton County.

48.     Prior to the sale in June 30, 2008, Anderson had two American

Express cards open and in regular use: a small Business Green Rewards Card, Card

No xxxx-xxxxxx-81000, and small business American Express Costco Cash

Rebate Card, Card No xxxx-xxxxxx-64002, but no AMEX corporate credit cards.

He also had approximately 12 - 14 Chase corporate credit cards in regular use.

Anderson has personal liability on the Chase cards and on the American Express

Business Green Rewards Card and American Express Costco Cash Rebate Card.

Anderson does not have personal responsibility on the American Express corporate

cards.

49. According to Fogleman' March 23, 2010 sworn statement, AMEX sent to AAI a set of corporate credit cards in the late Spring/early Summer of 2008. AAI never used or activated these corporate credit cards and does not believe that it ever requested that American Express issue the cards. Anderson did not know of the existence of these un-activated cards on June 30, 2008. AAI or Sunbelt Office Products, LLC may have had an earlier batch of AMEX corporate credit cards that were opened in 2005 and cancelled in 2006.

50. According to Fogleman's March sworn statement, while he was an employee of Lonesource and in the scope of his job function, (i) he activated these AMEX corporate cards in August 2008, (ii) he communicated to AMEX that the Sunbelt Office Supplies business had been sold to Lonesource, and (iii) he provided AMEX with Lonesource's taxpayer identification number. (Fogleman Statement 36:06 – 37:05, Exhibit 2 to this Complaint.) On information and belief, additional AMEX corporate cards may have been sent to Lonesource after July 1, 2008.

51. American Express appears to regard Lonesource as the responsible party on the AMEX corporate cards activated by Fogleman, not AAI or Anderson.

52. According to Fogleman's sworn statement, from July 1, 2008 until he was terminated in March 2010, Fogleman was employed by Lonesource as

Accounting Manager.  From July 1, 2008 until Mark Woznik was hired in October 2008, Fogleman was under the direct supervision of James Carr, Corporate Controller.  After Mr. Woznik was hired in October 2008, Fogleman was under the direct supervision of Mark Woznik, Division Controller but continued to have dialog with and perform work for James Carr.  Fogleman was also occasionally given projects by and subject to the direction of David Ryan, CFO of Lonesource, and Brain Rossi, Division President and Senior Vice President who was also in charge of the Atlanta office. (Fogleman Statement 6:17 – 8:06, Exhibit 2 to this Complaint.)

53.     Part of Fogleman's job while at Lonesource was accounts payable. He would process payments that were authorized to be paid by one of the persons possessing check-writing authority on behalf of Lonesource.  Usually, physical checks were printed, executed and mailed to vendors.  However, AMEX and Chase credit card statements and certain other large accounts were paid electronically by "Check by Phone" by Fogleman after obtaining permission or consent of one of the four persons having check writing authority or after having obtained permission from Mark Woznik, Division Controller.

54.     According to Fogleman's sworn statement, there were four persons with check writing authority on the Capital Bank accounts that he worked with in

accounts payable.   According to Fogleman, these persons included James Carr, Brian Rossi, Andy Gantert and David Ryan (and/or Brad King).  Fogleman stated that he never processed a payment without the authorization of one of these persons or Mark Woznik (Fogleman's direct boss).  (Fogleman Statement 40:17 – 43:23.)

55.    Practically speaking, Lonesource's Sunbelt operating account with Capital Bank generated a great deal of cash as Sunbelt's customers paid invoices. While Fogleman was working for Lonesource, James Carr, Lonesource's Corporate Controller, would regularly sweep the cash out of the Sunbelt operating account with Capital Bank and put the cash in other Lonesource accounts.

56.    When large bills owed by Lonesource, such as the AMEX or Chase bills, had to be paid out of the Sunbelt operating account, Mr. Carr would have to know about the bills and the timing of the payments in order to avoid sweeping the funds necessary to pay the bills out of the Sunbelt operating account.  Mr. Carr's knowledge that the AMEX and Chase statements were being paid constitutes a ratification by Lonesource of such payment.

57.    In early September 2008, Anderson (who was then acting as a consultant to Lonesource) became unhappy with Fogleman's performance and suggested to Lonesource that it replace Fogleman.

17

58.     In October or November 2008, Lonesource did place Fogleman under the supervision of Mark Woznik but did not terminate him.

59.     Prior to the time that Woznik was hired, Fogleman reported directly to James Carr, Corporate Controller.  From and after the time when Anderson advised Lonesource that Lonesource should replace Fogleman for poor job performance, Lonesource was on notice to monitor Fogleman's work and had reason to know that there might be problems with his work.

60.     In September or early October 2008 Anderson asked that Lonesource stop using the Chase and American Express credit cards of Anderson and AAI.  He made this request because the use of the credit cards was intended to be on a transitional basis only, to permit Lonesource to operate until it obtained its own cards and Lonesource should then have its own credit cards in place.

61.     In September or early October 2008 Fogleman told Anderson that Lonesource had ceased using the cards.  Fogleman made that statement in presence of Brian Rossi, a VP of Lonesource, in Mr. Rossi's office.  In November 2008, Lonesource did significantly reduce its use of the AMEX Costco Small Business cards (last charge on March 9, 2009) and most of the Chase cards.  Lonesource continued, however, to use three of the Chase cards: Fogleman's, Rossi's and Gantert's cards.

62.     Lonesource also continued to use the American Express corporate cards, which had been activated by Lonesource and were then  the direct responsibility of Lonesource.

63.     Sometime in March 2010, Lonesource discovered that Fogleman was using the AMEX and Chase credit cards for his personal purposes.

64.     Lonesource terminated Fogleman in March 2011, although Lonesource continued to consult with Fogleman on various matters for several weeks thereafter.

65.     A review of the Chase statements for December 2009 and November 2009 that Lonesource reversed shows a mixture legitimate Lonesource business expenses as well as personal and business expenses of Fogleman.  Each of these Chase statements include a separate listing of charges for Brian Rossi, Andrew Gantert and Brent Fogleman, all of which contribute to the total due on the statement.  A simple review of Fogleman's charges would have shown that many of them were personal.  A copy of these Chase statements is attached as Exhibit 3.

66.     In early March 2010, after learning of Fogleman's termination and the financial transaction fraud that he had committed against Lonesource, Anderson requested financial records from American Express and Chase to determine if

Fogleman had committed similar fraud while working as an employee of AAI prior to June 2008.

67.     Anderson discovered in March 2010 that Fogleman had also defrauded AAI of approximately $242,000.  At no time prior to discovering this fraud in early March 2010 did Anderson know of or suspect that Fogleman had defrauded AAI or Anderson.

68.     On or about March 23, 2010, at Anderson's request, Fogleman made a Videotaped Statement Under Oath of Brent Fogleman where he answered some, but not all, the questions posed to him by Anderson's counsel.  In his sworn statement, Fogleman provided a great deal of detail as to how payments on credit card statements were approved and processed at Lonesource.  A copy of Mr. Fogleman's Statement, excluding exhibits thereto, is attached hereto as Exhibit 2.

69.     In March 2010, after discovering Fogleman's theft from Lonesource, Brad King, CEO of Lonesource, executed six Unauthorized or Improper ACH Debit statements, each a written statement under penalty of perjury, with respect to a total of approximately $475,000 of allegedly unauthorized payments to American Express, and submitted these to Capital Bank.  (Exhibit 1.)  On information and belief these statements were transmitted electronically over wires in interstate commerce to Capital Bank, American Express and Chase Bank.

70.    In each of these six Unauthorized or Improper ACH Debit statements

Mr. King swore that each debit was an "Unauthorized Debit".  Mr. King attests, on

behalf of Lonesource:  "I did not authorize, and I have not ever authorized,

[American Express] to originate one or more ACH entries to debit funds from any

account at this financial institution."  See Exhibit 1.  Each of these six statements

identifies American Express by the term "AMEX" followed by a distinct series of

numbers.  Lonesource did in fact authorize Fogleman to make payments to

American Express while he was an employee of Lonesource; his superiors knew he

was making the payments and making payments to American Express was part of

Fogleman's regular job activities.

71.    Roughly contemporaneously with the submission of the ACH

Statements to Capital Bank to reverse payments made to American Express, on

information and belief, Lonesource also submitted two ACH Statements to Capital

Bank to reverse approximately two months of payments to Chase Bank (1/14/2010

returned amount of $10,598.23; 2/10/2010 returned amount $7,126.34).  These

fraudulently reversed charges, plus the unpaid balance from February 2010 and the

March 2010 sum to $30,190.12 and resulted in Chase Bank charging Anderson

$31,868.  These Chase statements include charges of Brent Fogleman, Brian Rossi

and Andy Gantert.  See Exhibit 3 for a copy of the Chase Statements.

72.     According to Fogleman's sworn statement, Lonesource had authorized Fogleman to make each of these ACH entries to debit funds from Lonesource's accounts to pay AMEX and Chase statements.  (Fogleman Statement 40:17 – 43:23, Exhibit 2 to this Complaint.)

73.     According to Fogleman's testimony, the Unauthorized or Improper ACH Debit statements submitted by Lonesource to Capital Bank to induce them to reverse payments made to American Express and Chase Bank were fraudulently made in bad faith.  The charges (debits) disputed were made with respect to AMEX and Chase credit card statements that, according to Fogleman's testimony, are likely to have contained legitimate, bone fide business charges of Lonesource (in addition to fraudulent charges incurred by Fogleman for his personal uses).

74.     Additionally, the ACH debit entries to pay AMEX and Chase were authorized by Lonesource in the ordinary course of business (even if without knowledge at the time that the AMEX and Chase statements contained some personal charges of Fogleman).  When Fogleman made the payments to AMEX and Chase, he was an employee of Lonesource and making the payments (debits) was part of his job responsibility.  Mr. King may not have personally authorized the debits to pay AMEX and Chase, but no doubt other duly authorized Lonesource personnel supervising Fogleman did so authorize such debits.

75.     Whether or not Mr. King perjured himself when he signed the
Unauthorized or Improper ACH Debit statements, his signing of these statements
and delivery of them to American Express and Chase was wrongful, in bad faith,
and designed to harm AAI and Anderson.  Lonesource and Mr. King specifically
intended to harm AAI and Anderson because they knew that if they succeeded in
causing Capital Bank to reverse payments made to AMEX and Chase then they
might be able to shift some or all of the cost of Fogleman's fraud, and
Lonesource's failure to supervise Fogleman, on to AAI and Anderson.

76.     Lonesource's fraudulent reversals of debits made to pay American
Express and Chase, amount to $472,294.74 and approximately $17,724.57
respectively, in March 2010, and refusal to pay remaining unpaid charges on the
Chase cards of approximately  $12,465.55, were made with the intent and hope
that after Capital Bank reversed the debits, American and Chase would look to
Anderson and AAI for full or partial recovery in lieu of Lonesource.

77.     On information and belief, Defendants have a long-standing working
relationship with Capital Bank that began around the June 30, 2008, when
Lonesource acquired most of the business assets of AAI.  On information and
belief, Capital Bank is familiar with Lonesource's business and its financial
operations, and also familiar with the regular processing of large payments through

the Check by Phone service used by Lonesource (and by Fogleman on behalf of

Lonesource).  As mentioned above, Fogleman used this Check by Phone service to

make the payments to Chase and American Express that Lonesource later reversed.

78.    In connection with the submission of Unauthorized or Improper ACH

Debit statements, on information and belief, Defendants Lonesource and King also

made defamatory statements about Plaintiffs Anderson and AAI to American

Express, Chase, Capital Bank and to some of Defendant Lonesource's employees.

Defendants, through their defamatory statements, caused Capital Bank to reverse

previously authorized payments to Chase and American Express and attempted to

cause American Express and Chase to hold Anderson responsible for Fogleman's

fraud and to associate Anderson with Fogleman's fraud.

79.    On information and belief, Defendants made additional oral and/or

written statements to Chase Bank, American Express, Capital Bank and some of

Lonesource's employees that are along the lines of the things Defendants said

about Plaintiffs in the March 19, 2010 demand letter to Anderson and AAI and in

the March 10, 2011 Third-Party Complaint.  (See ¶ 20 of this Complaint for

citations to the March 10, 2011 Third-Party Complaint.)  In other words,

Defendants defamed Plaintiffs by blaming Plaintiffs for Fogleman's $1,200,000

fraud against Lonesource and alleging that Fogleman was Plaintiffs' agent in the commission of essentially criminal acts against Lonesource.

80.    On information and belief, Lonesource is unlikely to have persuaded Capital Bank to process the ACH reversals or to have persuaded Chase to pursue Plaintiffs Anderson and AAI unless Lonesource, through oral or written statements, attributed Fogleman's fraud or financial responsibility for the fraud to Anderson or AAI.

81.    While the statements Lonesource made in its March 10, 2011 Third-Party Complaint appear to be privileged under O.C.G.A. § 51-5-8, and accordingly are not a permissible basis of a cause of action for libel under Georgia law, any oral and written defamatory statements made by Lonesource to American Express, Chase, Capital Bank and to Lonesource's employees made prior thereto are only possibly conditionally privileged under O.C.G.A. 51-5-7(3), and then only if certain conditions are met.

82.    Neither Lonesource nor King can satisfy the conditional privilege set forth in O.C.G.A. § 51-5-7(3) because Defendants' statements were not made in good faith.

83.    Additionally, O.C.G.A. § 51-5-9 prevents Lonesource and King from relying on the conditional privilege in O.C.G.A. 51-5-7(3) because Defendants

acted maliciously within the meaning of O.C.G.A. § 51-5-9.  Defendants knew or recklessly disregarded the facts (i) that Fogleman was not Anderson or AAI's agent, (ii) that Lonesource had legal responsibility for Fogleman's wrongful use of the cards under the contract reached with respect to the use of the cards on June 30, 2008, (iii) that Lonesource had legal responsibility for Fogleman's wrongful use of the cards because of the bailment of the cards imposed legal duties on Lonesource that would be violated by attempting to shift financial responsibility for Fogleman's fraud away from Lonesource and onto Anderson and AAI, and (iv) that Lonesource had legal responsibility for Fogleman's wrongful use of the cards under the indemnity provisions of the June 30, 2008 Asset Purchase Agreement.

84.    Plaintiffs enjoy a very good reputation in the industry and generally. Defendants' false, outrageous and defamatory statements have injured this reputation in the industry and generally and caused Plaintiffs reputational harm and emotional distress.

85.    Through their defamatory statements, Defendants were successful in causing Capital Bank to reverse payments made to Chase and American Express and in causing Chase to look to Plaintiffs for compensation and, as of the date of this complaint, mostly unsuccessful in causing American Express to look to Plaintiffs for compensation (although American Express did name as a defendant

Sunbelt Office Supplies, LLC, a business which was formed by Anderson in 1999,

ceased operations in 2001 and was administratively dissolved in 2005).

86.     The Asset Purchase Agreement entered into on June 30, 2008 between

Lonesource, AAI and AAI's shareholders contains mutual indemnification

language.   In Section 18C of the Asset Purchase Agreement obligates Lonesource

to indemnify and hold Anderson and AAI harmless in the present suit.   Section

18C provides:

> C.     Subject to the provisions of Section 23. and Section 24. hereof, the
> Buyer shall indemnify and hold harmless the Seller and the Shareholders
> against and in respect of:
>
> (1)     Any loss, cost, expense, damage or deficiency resulting from any
> misrepresentation, breach or warranty or nonfulfillment of any agreement on
> the part of the Buyer in this Agreement of from any misrepresentation in or
> omission from any certificate or statement furnished or to be furnished to the
> Seller and/or the Shareholders, pursuant to this Agreement.
>
> (2)     Any loss, cost, expense, damage, deficiency or liability arising from
> or relating to the ownership and use of the Assets or the operations of the
> Business by the Buyer from and after to the Closing.
>
> [(3)]   All actions, suits, proceedings, demands, assessments, judgments,
> costs, including reasonable attorneys' fees, and expenses incident to any of
> the foregoing.
>
> [In the actual agreement, this clause "(3)" is labeled "a." and is indented.]

87.     The foregoing indemnity obligation is qualified by the following text:

<u>Section 23.  Survival of Representations and Warranties</u>.  All agreements, covenants, indemnities, representations and warranties made by the parties in this Agreement shall survive the Closing for a period of twelve (12) months and thereafter shall be of no further force or effect (except as may be provided in the Consulting Agreement, Software License, the Promissory Note, and the Employment Agreement, each of which shall be separate and subject to its own terms); provided, that, **in the event of actual fraud** such agreements, covenants, representations and warranties shall survive the Closing for the applicable statute of limitations.  Buyer's exclusive remedy for breach of this Agreement, its covenants, indemnities, representations and warranties set forth herein, or for any act or omission taken by Seller or Shareholders in connection with the preparation, execution or performance of this Agreement or the transactions contemplated by this Agreement, shall be indemnification under Section 18. hereof and shall be, in all cases, subject to Section 24. below. [Emphasis added.]

88.    If Fogleman's testimony is correct, Lonesource and Brad King committed actual fraud when Brad King executed and delivered on behalf of Lonesource the Unauthorized or Improper ACH Debit statements to Capital Bank. Additionally, one of the five counts of credit card transaction fraud against Anderson to which Fogleman plead guilty related to Fogleman's use of the Chase credit card while an employee of Lonesource with responsibility for the cards. Consequently, the 12-month limitation period in Section 23 of the Asset Purchase Agreement does not limit Lonesource's indemnity obligation under Section 18 of the Asset Purchase Agreement.

89.    By letter dated March 19, 2010, Lonesource made demand upon Anderson and AAI for $1,200,00, alleging that "[t]he total amount that Lonesource

has been able to determine that Mr. Fogleman stole from Lonesource for the benefit of AAI is $1,251,291.99".  Anderson and AAI responded by letter denying Lonesource's allegations.

90.    Lonesource initially did not pay Anderson amounts due him under this Consulting Agreement with Lonesource in April 2010 (presumably, Lonesource was using the alleged $1,200,000 claim to offset amounts Lonesource still owed Anderson under his Consulting Agreement).

91.    On April 6, 2010, Anderson sent written notice of termination of the Non-competition Agreement between the parties, which notice provided that if past due payments were not cured within 30 days the Non-competition Agreement would terminate (in accordance with its terms).  Lonesource cured such defaults by making payments under the Consulting Agreement until the last payment due (July 2010).

92.    On March 16, 2010 Anderson requested copies of business records from Brad King at Lonesource that he was entitled to request under the Asset Purchase Agreement.  Mr. King never responded to Anderson's request.   In September 15, 2010, about seven months late, Brian Rossi called Mr. Anderson and offered to deliver two boxes of records.  However, Lonesource omitted all but three AMEX statements and the boxes delivered were not close to a complete set

of records.  Lonesource also impounded Anderson's computer and did not deliver it to him.

93.     Anderson and AAI continue to receive demands from Chase, through collection lawyers, with respect to $31,868 of Chase debt.  As of March 21, 2011, credit reports show that Chase reported $31,868 of bad debt against Anderson and that this bad debt will be reflected on Anderson's credit report for 7 years.  Chase would not grant Anderson and AAI another card without payment of the debt. Lonesource's and Mr. King's actions also damage Anderson's business reputation.

94.     AMEX may well attempt to sue Anderson and AAI for the same amounts that it has sued Lonesource.  Anderson and AAI believe that they have valid defenses against any such suit.

95.     Fogleman plead guilty to five counts of financial transaction fraud November 30, 2010.  Most of the counts related to financial transaction fraud committed by Fogleman while he was an employee of AAI, prior to June 30, 2008 (i.e., fraud occurring on March 6, 2007, September 27, 2007, August 1, 2007 and December 29, 2007; one charge related to financial transaction fraud occurring on November 29, 2009).  Lonesource did not press charges against Fogleman, although it had the opportunity to do so.  As part of Fogleman's sentence, he was ordered to pay Anderson $241,163.50 of restitution (of which he has paid $2,000).

Here is a link for the Fogleman criminal charges:

http://www.gwinnettcourts.com/#casedetail/case:10%2db%2d04358%2d8/

96.    Of the $241,163.50 of restitution Fogleman was ordered to pay

Anderson and AAI, $31,868 was for amounts owed to Chase.   The Chase

statement for the period 11/29/09 – 12/28/09 shows 409.00 of charges by Brian

Rossi (Card 2183), $120.00 of charges by Andrew Gantert (Card 7800), and

$5,123.85 for Brent Fogleman.  See Exhibit 3 for Chase statements.

97.    By letter dated April 22, 2011, Anderson demanded that Lonesource

reimburse Anderson and AAI under the Asset Purchase Agreement for $59,919,

which included the $31,868 demanded by Chase and legal fees and expenses since

Lonesource first made its written demand on Anderson on March 19, 2010.

Lonesource failed to respond to these demands.  Since that time and prior to filing

this Complaint, Anderson has incurred additional legal expenses in excess of

$20,000.

### Anderson and AAI's First Cause of Action Against Lonesource and King
### Count 1 – Defamation (Libel and Slander)

98.    Anderson and AAI incorporate by reference the facts and allegations

in paragraphs 1 – 97 above.

99.    Defendants Lonesource and King, on information and belief, have

defamed Plaintiffs through false libelous written statements and slanderous oral

statements to American Express, Chase, Capital Bank made in March 2010 (and perhaps thereafter) in connection with Defendants efforts to (i) cause Capital Bank to reverse ACH payments made to Chase and American Express, (ii) cause Chase to hold Anderson and AAI responsible, instead of Lonesource, for payments to Chase that Lonesource successfully reversed and (iii) attempt to cause American Express to hold Anderson and AAI responsible for ACH payments reversed by Lonesource and King.

100.   On information and belief, beginning in March 2010, Plaintiffs defamed, libeled and slandered Plaintiffs by alleging to Capital Bank, American Express, Chase and to some of Lonesource's employees that Fogleman, a former employee of Plaintiff AAI, was Plaintiffs' agent and that Plaintiffs were, directly or indirectly, responsible for and culpable of Mr. Fogleman's alleged $1,200,000 theft and fraud against Lonesource and that Plaintiffs had converted Lonesource's property.

101.   Defendant Lonesource's letter to Plaintiffs dated March 19, 2010, in which Lonesource alleged that Fogleman was Anderson and AAI's agent and in which it blamed Anderson and AAI for Fogleman's theft and fraud against Lonesource, provides an adequate factual basis for pleading defamation on information and belief.  Lonesource and King had an incentive to make these

statements to Capital Bank, American Express and Chase, since doing so would

further Lonesource's efforts to make Anderson and AAI pay for Fogleman's fraud

against Lonesource.  It is unlikely that Defendant King could have resisted making

slanderous statements about Plaintiffs and unlikely that he could have persuaded

Capital Bank to reverse payments made by "Check by Phone" of Lonesource's

employee who had made such payments using "Check by Phone" for about 20

months without some effort, oral or in writing or both, by Defendants to blame

Plaintiffs.

102.   Defendant Lonesource reiterated many of these false, outrageous and

libelous statements, first made in its March 19, 2010 letter, in its March 10, 2011

Third-Party Complaint against Anderson and Lonesource, in which it reiterated its

allegation that Fogleman was Anderson and AAI's agent and that Anderson and

AAI converted over $1,200,000 of Lonesource's property.  The statements in the

Third Party Complaint make it likely that Lonesource previously made these

allegations orally, and perhaps in writing, to Capital Bank, American Express,

Chase Bank and some of Lonesource's employees.

103.   Defendants made defamatory statements with the malicious intent of

harming the good business reputation of Plaintiffs Anderson and AAI, which had

been cultivated over many years, and did harm Plaintiffs' reputation. Defendants also caused Plaintiff Anderson considerable mental distress, outrage and anguish.

104.   On information and belief, Defendants slanderous oral statements to Capital Bank also cause special damages to Plaintiffs by facilitating Capital Bank's reversal of ACH debits made to pay Chase Bank and American Express. Defendants efforts to associated Plaintiffs with Fogleman's fraud also entitle Plaintiffs to general damages that flow from the harm and punitive damages.

**Anderson and AAI Second Cause of Action**
**Against Lonesource and King**
**Count 2 – Georgia Civil Rico**

105.   Anderson and AAI incorporate by reference the allegations and facts in paragraphs 1 – 104 above.

106.   Defendants have violated the Georgia Civil RICO statute set forth at O.C.G.A. § 16-14-4(a).  By fraudulently making and submitting over six false statements to Capital Bank to cause Capital Bank to reverse debits previously made by Lonesource to pay American Express and Chase valid obligations owed to American Express and Chase, Defendants acquired personal property of American Express and Chase and, in the case of Chase, subjected Plaintiffs to liability.

107.   By reversing the debits to both American Express and Chase in March 2010, Defendants intended to shift the cost of Fogleman's fraud away from Lonesource, where it belongs, and onto Plaintiffs and maliciously intended to harm Plaintiffs.  Defendants succeeded in proximately causing Plaintiffs direct harm because Chase has sought to hold Anderson and AAI responsible for the reversed debits and has reported Plaintiffs as being responsible for bad debt in the amount of $31,868.  Plaintiffs continue to suffer direct harm through Defendants efforts to avoid paying American Express by blaming Plaintiffs; these efforts, include filing a Third Party Complaint on March 2, 2011 (which it withdrew on March 31, 2011), as described in paragraphs 13 – 29 above, which are essentially a continuation of Defendants' initial fraud and theft and have resulted in Plaintiffs incurring significant legal fees.

108.   Defendant's fraudulent making and submitting false and perjurious ACH statements to Capital Bank to cause Capital Bank to reverse six debits made to pay American Express and to reverse at least two debits made to pay Chase Bank amounts duly owed to them constituted (1) a "pattern of racketeering activity" under O.C.G.A. § 16-14-3(8), because the making and transmitting of each such statement constitutes a separate predicate act and there are at least six and probably eight or more predicate acts and (2) "racketeering activity," *i.e.*,

RICO predicate acts, under one or more of O.C.G.A. § 16-14-3(8)(A)(ix) (relating to theft), (xv) (relating to perjury and other falsifications), and (xxiii) (relating to unlawful use of financial transaction cards) and O.C.G.A. § 16-14-3(8)(B) (relating to theft under the laws of North Carolina and the United States).

109.   Defendants submission of such fraudulent statements to Capital Bank is theft by deception under O.C.G.A. § 16-8-3 because they "obtained property" (money from American Express and Chase) by "deceitful means" (the false and perjurious ACH statements) . . . "with the intention of depriving the owner of the property."

110.   Defendants' conduct is squarely a violation of 18 U.S.C. § 1343 (wire fraud), because the type of Federal wire fraud at issue in this case is a type of theft under O.C.G.A. § 16-14-3(8)(B).

111.   O.C.G.A. § 16-14-6(c) entitles Plaintiffs to receive from Defendants three times "actual damages sustained" and punitive damages.  Actual damages broadly construed amount to at least $79,919 and triple such actual damages amounts to approximately $240,000.  Punitive damages are justified to punish Defendants for what is simply outrageous, offensive and inexcusable conduct and conduct that may be repeated.

**Anderson and AAI's Third Cause of Action**

**Against Lonesource and King**
**Count 3 – Tort of intending to harm and actually harming a victim by**
**violating laws prohibiting the tendering of false documents under penalties of**
**perjury**

112.   Anderson and AAI incorporate by reference the facts and allegations

in paragraphs 1 – 111 above.

113.   Georgia law recognizes that in special circumstances the violation of a

criminal law may give rise to tort liability.  *See* Charles C. Adams, GEORGIA LAW

OF TORTS pp. 124 – 125 (2010 – 2011 Edition) (violation of criminal statute may

give rise to tort liability if (i) a person of ordinary intelligence would know that the

injurious conduct is the sort protected by the criminal statute, (ii) the injured party

falls within the class of persons the statute was intended to protect, and (iii) the

injury was of the type that the statute in question was aimed at guarding against.)

114.   Defendant Lonesource and King's knowing, intentional and malicious

submission of false statements under penalties of perjury, in a document submitted

to Capital Bank to reverse payments to American Express and Capital Bank made

through an ACH debit, violate Federal and State law.  These violations caused

Plaintiffs harm.  Accordingly, Plaintiffs are entitled to recover.

**Anderson and AAI's Fourth Cause of Action
Against Lonesource and King
Count 4 – Conversion and Trover**

115.   Anderson and AAI incorporate by reference the facts and statements in paragraphs 1 – 114 above.

116.   At the closing of the Asset Purchase Agreement on June 30, 2008, AAI and Lonesource agreed that Lonesource would be permitted to use the Chase and AMEX cards and that Lonesource would pay the charges.

117.   Lonesource had constructive knowledge of Fogleman's misuse of the credit cards and its repeated payment of the card statements, knowing their contents, is a ratification of Fogleman's actions.  Lonesource converted Anderson and AAI's property by permitting Fogleman to incur large personal expenses on the cards, thereby subjecting Anderson and AAI to potential liability.

118.   Lonesource additionally converted Anderson and AAI's property by causing Chase to look to Anderson and AAI for payment with respect to the debits reversed with Capital Bank in response to Lonesource's submission of false ACH statements.   Lonesource refused Plaintiffs written demands to make the converted property whole by paying the credit card charges.

**Anderson and AAI's Fifth Cause of Action**
**Against Lonesource and King**
**Count 5 – Trespass Against Anderson's and AAI's Rights in the Cards**

119.   Anderson and AAI incorporate by reference the facts and statements in paragraphs 1 – 118 above.

120.   With respect to the AMEX and Chase credits cards that Anderson and AAI entrusted to Lonesource, AAI is a bailor and Lonesource is a bailee.  This bailment was established on June 30, 2008 by oral agreement between Lonesource, Anderson and AAI.  This bailment was made at the request of and solely for the benefit of Lonesource, subjecting Lonesource to enhanced duties of care with respect to the cards.

121.   By reversing charges on the AMEX and Chase statements, though the fraudulent submission of false statements to Capital Bank, Lonesource intentionally trespassed AAI's rights in the cards under O.C.G.A. § 51-10-4. Lonesource's trespass of AAI's rights was made with the specific intent to harm Anderson and AAI.

**Anderson and AAI's Sixth Cause of Action**
**Against Lonesource and King**
**Count 6 – Malicious Interference With Contractual and Business**
**Relationships**

122.   Anderson and AAI incorporate by reference the facts and statements in paragraphs 1 – 121 above.

123.   By reversing charges on the Chase statements, though the fraudulent submission of false statements to Capital Bank, Lonesource intentionally interfered with the contractual and business relationship of Anderson and AAI with Chase. Anderson and AAI have been harmed by Lonesource's interference because Chase is seeking to collected the unpaid amounts from AAI through collection lawyers, has tarnished Anderson and AAI's credit by listing the debt as bad debt with credit reporting agencies and would not issue Anderson new cards unless the debt were paid or settled.

### Anderson and AAI's Seventh Cause of Action
### Against Lonesource (and not King)
### Count 7 – Negligent Supervision

124.   Anderson and AAI incorporate by reference the facts and statements in paragraphs 1 – 123 above.

125.   Because of the bailment created with respect to the AMEX and Chase cards, Lonesource was subject to a duty under O.C.G.A. § 4-12-40 to properly supervise Fogleman, who was responsible for making payments on the cards and for his use of the cards.  Lonesource did not properly supervise or review Fogleman's work or use of the AMEX and Chase cards.  Lonesource's failure to supervise Fogleman's work and monitor his use of the cards caused Anderson and AAI monetary damages for which Lonesource is liable.

**Anderson and AAI's Eighth Cause of Action**
**Against Lonesource (and not King)**
**Count 8 – Negligent Retention**

126.    Anderson and AAI incorporate by reference the facts and statements in paragraphs 1 – 125 above.

127.    Anderson placed Lonesource on notice that Fogleman was not doing a good job in September 2008 and needed to be replaced.  Thereafter, Defendant Lonesource had reason to know and even constructive knowledge of Fogleman's fraudulent use of credit cards.

128.    Lonesource negligently retained Fogleman and its negligent retention of Fogleman has cause Anderson and AAI harm.

**Anderson and AAI's Ninth Cause of Action**
**Against Lonesource (and not King)**
**Count 9 – *Respondeat Superior***

129.    Anderson and AAI incorporate by reference the facts and statements in paragraphs 1 – 128 above.

130.    In between June 30, 2008 and sometime in March 2010 Fogleman was an Accounting Director for Lonesource and had responsibility for payment of the AMEX and Chase statements.  Fogleman also had responsibility for the cards used by him under O.C.G.A. § 11-3-405(a)(3).  Lonesource authorized in advance Fogleman's payment of the AMEX and Chase statements, which payments

Lonesource later reversed.  It also ratified such payments because Fogleman's superiors in Cary could review and did review the amounts Fogleman caused to be paid to AMEX and Chase out of Lonesource's operating account with Capital Bank.  By reversing the payments that Lonesource made to AMEX and Chase, Defendant Lonesource ratified, approved and adopted Fogleman's credit card transaction fraud against Anderson and AAI.

131.   Consequently, Lonesource is liable to Anderson and AAI under the doctrine of *respondeat superior*, see O.C.G.A. § 51-2-2, for any damages Fogleman's wrongful use of the cards causes Anderson and AAI.

132.   Defendant King is Defendant Lonesource's CEO and at all relevevant times was acting within the scope of his employment and agency.  Consequently, Defendant Lonesource is liable for the damages Defendant King's torts caused Plaintiffs.

### Anderson and AAI's Tenth Cause of Action Against Lonesource
### Count 10 – Breach of Contract

133.   Anderson and AAI incorporate by reference the facts and statements in paragraphs 1 – 132 above.

134.   Lonesource and AAI formed a contract with respect to the use of the Chase and AMEX cards following or at closing of the Asset Purchase Agreement on June 30, 2008.  Under this agreement, Lonesource was permitted to use the

42

cards.  Lonesource also agreed to be responsible for charges on the cards and, essentially, assumed liability for charges on the cards.  Lonesource breached the agreement by failing to pay the amounts due on the cards and making, under penalties of perjury, factually inaccurate and fraudulent Unauthorized or Improper ACH Debit statements to Capital Bank with respect to debits identified therein, causing Capital Bank to reverse payments to AMEX and Chase, thereby exposing Anderson and AAI to litigation and damages.

135.   Consequently, Lonesource is liable to Anderson and AAI for damages for breach of contract.

## Anderson and AAI's Eleventh Cause of Action
## Against Lonesource (and not King)
## Count 11 – Indemnity

136.   Anderson and AAI incorporate by reference the allegations and facts in paragraphs 1 – 135 above.

137.   Anderson and AAI are entitled to indemnification from Lonesource under Section 18 of the June 30, 2008 Asset Purchase Agreement.  Lonesource is responsible for Anderson and AAI's reasonable attorneys' fees and expenses and related costs, such as Fogleman's sworn statement, from Lonesource's initial demand in March 2010.  Anderson and AAI are also entitled to indemnification from Lonesource under O.C.G.A. 51-12-32(c).

138.   Defendant Lonesource is also liable to Anderson and AAI, under the indemnity provisions of the June 30, 2008 Asset Purchase Agreement, for damages awarded in this action against Defendant King, to the extent Defendant King does not pay them.

**Anderson and AAI Twelfth Cause of Action**
**Against Lonesource and King**
**Count 12 – Bad Faith and Stubbornly Litigious**

139.   Anderson and AAI incorporate by reference the allegations and facts in paragraphs 1 – 138 above.

140.   Defendants Lonesource and King have acted in bad faith, had been stubbornly litigious and have caused Anderson and AAI unnecessary trouble and expense.  Evidence of bad faith includes (i) Brad King's signing of the Unauthorized or Improper ACH Debit statements, (ii) Lonesource's March 19, 2010 demand letter, (iii) the filing of the Third Party Complaint against Anderson and AAI, (iv) Lonesource's refusal to respond to Plaintiffs demand letters that clearly show Lonesource's liability, (v) Lonesource's refusal to provide complete records after a valid request for the records, and (vi) impounding Anderson's computer.

141.   Consequently, Anderson and AAI are entitled to attorneys' fees and expenses from Lonesource under O.C.G.A. §13-6-11.

## JURY DEMAND

Plaintiffs demand a trial by jury.

## VERIFICATION

A verification of this Complaint is attached as Exhibit 4.

## PRAYER FOR RELIEF

WHEREFOR, Plaintiffs Anderson and AAI pray for relief as follows:

(a)     That the Defendants be served with process;

(b)     That this matter, and Plaintiffs Anderson and AAI's claims, be heard

by an impartial jury;

(c)     That Plaintiffs Anderson and AAI be awarded actual, consequential

and special damages in amounts to be proved at trial, and actual

damages sustained under O.C.G.A. § 16-14-6(c) shall be tripled;

(d)     That Plaintiffs Anderson and AAI be awarded general damages as

may be determined by the enlightened conscience of an impartial jury,

which Anderson and AAI pray shall not be less than the $500,000;

(e)     That Plaintiffs Anderson and AAI be awarded punitive damages in an

amount to be determined by the enlightened conscience of an

impartial jury, which amount Anderson and AAI pray be not less than

$500,000;

(f)     That Defendants Lonesource and King be permanently enjoined from further acts of defamation against Plaintiffs;

(g)     That Plaintiffs Anderson and AAI be entitled to recover their reasonable attorneys fees and expenses of this litigation and in dealing with Lonesource's frivolous demands beginning in March 2010, and all other costs under Section 18 of the Asset Purchase Agreement and as the law otherwise permits;

(h)     That Defendant Lonesource be held liable under Section 18 of the Asset Purchase Agreement and under the doctrine of *respondeat superior* for King's portion of any damage award;

(i)     That any damage award against Defendant King specifically identify how much of such award is attributed to King's fraud or willful and malicious injury;

(j)     That Defendants Lonesource and King shall be charged with all costs in this matter; and

(k)     Such additional relief against Defendants Lonesource and King as may be just and proper.

RESPECTFULLY SUBMITTED, this 17th day of June, 2011.


s/ Carl L. Sollee, Esq.
Bar No. 000242
Attorney for the Plaintiffs
James L. Anderson and
Anderson & Associates, Inc.
Carl L. Sollee, LLC
1376 Sheffield Drive, NE
Atlanta, GA 30329
Phone: (404) 633-8223
E-mail:  carl@solleelaw.com